*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 22-CM-0692

OMAR RANSOM, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-DVM-000835)

(Hon. Jennifer M. Anderson, Trial Judge)

(Argued April 9, 2024                    Decided September 12, 2024)

*Jason K. Clark* for appellant.

*Brian M. Hanley*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb* and *Katharine Yaske*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE, DEAHL, and SHANKER, *Associate Judges*.[*]

MCLEESE, *Associate Judge*: Appellant Omar Ransom was convicted of two

counts of simple assault, one against Marquita Williams and one against

---

[*] Associate Judge AliKhan was originally assigned to this case. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Judge McLeese has been assigned to take her place on the panel.

Ms. Williams's daughter M.W., and one count of attempted possession of a prohibited weapon (specifically, a belt). Mr. Ransom argues that the evidence was insufficient to support his convictions and that the trial court abused its discretion in admitting six video exhibits into evidence.

The United States concedes that the evidence was insufficient to support Mr. Ransom's conviction for attempted possession of a prohibited weapon. We accept that concession and therefore reverse that conviction. We hold that the evidence was sufficient to support Mr. Ransom's assault convictions.

We also hold that the trial court erred in admitting one of the challenged video exhibits and that the admission of that exhibit was harmful error with respect to Mr. Ransom's conviction for assaulting M.W. We therefore vacate that conviction and remand the case for further proceedings. Finally, we hold that any error in admitting the challenged video exhibits was harmless error with respect to Mr. Ransom's conviction for assaulting Ms. Williams. We therefore affirm that conviction.

## I. Factual and Procedural Background

Ms. Williams testified at trial that in June 2021, she and Mr. Ransom had been dating for about a year. On the day at issue, they had an argument at a Metro station,

and Mr. Ransom slapped Ms. Williams. Nevertheless, they went together to a doctor's appointment at which Ms. Williams was informed that she was pregnant. After the appointment, Ms. Williams did not want to be around Mr. Ransom and did not want him to come to her apartment.

After sitting in the park with her five-year-old daughter M.W., Ms. Williams saw Mr. Ransom near the front of her building. To avoid Mr. Ransom, Ms. Williams and her daughter ran into the building through the back door and went up to her apartment. Mr. Ransom then kicked in the door to Ms. Williams's apartment, went inside, and started hitting Ms. Williams. Mr. Ransom punched Ms. Williams in the face multiple times. Ms. Williams tried to get away, but Mr. Ransom dragged her back and kept hitting her.

M.W. started to scream, and Mr. Ransom told her to be quiet. M.W. kept crying and screaming, and Mr. Ransom went into the room where M.W. was. Just before Mr. Ransom went into that room, Ms. Williams saw that he had a gun. Ms. Williams grabbed Mr. Ransom and told M.W. to run out of the apartment. M.W. did not run, however, and Mr. Ransom hit M.W. with a belt twice in the legs. Mr. Ransom also hit Ms. Williams in the head with the gun several times.

Ms. Williams was able to escape from the apartment, and she spoke with a neighbor, Sonya Pryor. According to Ms. Pryor, Ms. Williams was sweating and

shaking, and she told Ms. Pryor that Mr. Ransom had beaten and pistol-whipped Ms. Williams. There was conflicting testimony as to whether Ms. Pryor called the police or whether the police arrived before she could call them.

Ms. Williams spoke with the police after they arrived, which was just after the assault. An officer's body-worn camera footage captured Ms. Williams's statements to the police. In the footage, Ms. Williams is shaking and crying, is breathing heavily, and has visible injuries on her face. Ms. Williams said that Mr. Ransom had hit her in the head with a gun. The United States also introduced two photographs of Ms. Williams showing injuries and swelling on her face and head. Ms. Williams testified that the photographs accurately depicted the injuries she suffered.

Through Ms. Williams, the United States introduced into evidence five ten-second video clips: Exhibits 1, 2, 3, 4, and 5. The clips were admitted over Mr. Ransom's objection that the clips were not adequately authenticated because they had no date or time stamps and no evidence was introduced about how or when they were created.

Exhibit 1 depicts a woman and a child entering a building. Ms. Williams agreed that the video was a fair and accurate representation of the back entrance of her building as she remembered it on the date of the incident. Ms. Williams further

testified that the video depicted her and her daughter entering the building, and she knew that the video depicted the date of the incident because she recognized the clothes she had been wearing that day.

Exhibit 2 depicts a woman and a child getting out of an elevator and running down a hallway. Ms. Williams testified that the video depicted the hallway of the floor she lived on. Ms. Williams agreed that the hallway depicted in the video looked how she remembered the hallway looking on the night of the incident. Although Ms. Williams had testified that she and her daughter took the stairs up to her apartment, Ms. Williams also testified that the exhibit showed her and her daughter getting out of the elevator. Ms. Williams did not explicitly testify as to whether the video was accurate on that point.

Exhibit 3 depicts a woman leaving an apartment and running down a hall toward another woman who has gotten out of an elevator. Ms. Williams testified that she recognized what was in Exhibit 3 as the hallway to her apartment. She agreed that the video contained a fair and accurate depiction of the hallway as she remembered it on the night in question. Ms. Williams also testified that the video showed her running down the hallway and Ms. Pryor getting off the elevator. Ms. Williams did not explicitly testify as to whether the video accurately depicted their actions on the night at issue.

Exhibit 4 depicts a woman opening a door and running into what appears to be a lobby area. Ms. Williams testified that the video fairly and accurately depicted the lobby area of her building as she remembered it on the night in question. Ms. Williams also testified that the video showed her running down a stairwell to the main entrance to her building. Ms. Williams did not explicitly testify as to whether the video accurately depicted her actions on the night at issue.

Exhibit 5 depicts a woman opening a door and then running out a pair of doors that are labeled as an exit. Ms. Williams testified that the exhibit fairly and accurately represented the entrance to her building as she remembered it on the night it issue. When asked what she saw in Exhibit 5, Ms. Williams testified, "I think the main entrance of my building to look for the officers." Ms. Williams did not explicitly testify as to whether the video accurately depicted her actions on the night at issue.

Ms. Pryor testified that while she and Ms. Williams were talking to the police, Ms. Pryor saw Mr. Ransom get out of the elevator holding a gun in his hand. The government then introduced Exhibit 7 through Ms. Pryor. Exhibit 7 depicts a man running from a hallway through what appears to be a lobby area. The man appears to be holding his pants up with one hand as he runs, while a belt hangs at his side. The man does not appear to be holding a gun.

Exhibit 7 has no date or time stamp, and no evidence was introduced about how or when it was created. Ms. Pryor said that she recognized the apartment building's lobby as depicted in the video. Although Ms. Pryor testified generally that the video fairly and accurately represented what she recalled happening on the night at issue, she identified two specific discrepancies. First, although Ms. Pryor had testified that Mr. Ransom had come out of the elevator, the video indicated that he came down the steps. Second, although Ms. Pryor had testified that Mr. Ransom had a gun in his hand, the video showed that he did not have a gun in his hand. Except to suggest without elaboration that her testimony about the gun was incorrect, Ms. Pryor did not try to reconcile her testimony that the video was accurate with her testimony identifying important discrepancies between her testimony and the video. Ms. Pryor acknowledged that she had been drinking vodka on the night of the incident and was not wearing her prescription eyeglasses when the incident occurred. Defense counsel objected on the ground that Exhibit 7 had not been adequately authenticated, but the trial court overruled the objection without explanation.

Mr. Ransom testified in his own defense as follows. He did not assault Ms. Williams or M.W. and did not possess a gun on the night in question. He entered Ms. Williams's apartment through the unlocked front door and did so in order to recover his money and phone charger. The two argued, and Ms. Williams might have sustained her injuries when she fell while trying to push Mr. Ransom out of her

apartment. Mr. Ransom acknowledged that he got angry. Addressing Exhibit 7, Mr. Ransom explained that his belt had broken that night and he was holding his pants to keep them from falling down. Mr. Ransom had scratches on his face, neck, and chest, but he did not take any pictures of them. As he was leaving the building, Mr. Ransom saw the police. Mr. Ransom ran, rather than stopping to talk to the police, because he was nervous and did not want to be arrested.

The trial court credited Ms. Williams's testimony that Mr. Ransom had hit Ms. Williams, noting in particular the photographs introduced into evidence showing bruises on Ms. Williams's face. The trial court also credited Ms. Williams's testimony that Mr. Ransom assaulted M.W. with a belt. On that charge, the trial court emphasized the events depicted in Exhibit 7, finding it "significant that [Mr. Ransom was] running out, that [he was] grabbing his belt." The trial court declined to credit Mr. Ransom's testimony as to the altercation with Ms. Williams. The trial court found that the bruises on Ms. Williams's face to be "way more consistent with being hit than a fall."

The trial court found Mr. Ransom guilty of attempted possession of a prohibited weapon (belt) and both counts of simple assault. The trial court found Mr. Ransom not guilty of a charge relating to the alleged possession of a gun. In

finding Mr. Ransom not guilty of that charge, the trial court noted that Exhibit 7 did not depict Mr. Ransom holding a gun.

## II. Analysis

### A. Sufficiency of the Evidence of Simple Assault

Mr. Ransom argues that the evidence at trial was insufficient to support his assault convictions beyond a reasonable doubt. We conclude that the evidence was sufficient to support Mr. Ransom's assault convictions.

"When assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact . . . ." *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (internal quotation marks omitted). The evidence is sufficient if, "after viewing the evidence in the light most favorable to the [government], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. United States*, 175 A.3d 623, 627 (D.C. 2017) (emphasis and internal quotation marks omitted). This court will not reverse a trial court's factual findings after a bench trial unless those findings are "plainly wrong or without evidence to support [them]." D.C. Code § 17-305(a). "We consider all evidence admitted by the trial

court, including erroneously admitted evidence, when conducting a sufficiency review." *Morales v. United States*, 248 A.3d 161, 185 (D.C. 2021). Accordingly, whether the challenged video exhibits were correctly admitted or not, for sufficiency purposes we consider them along with the rest of the evidence admitted at trial.

Mr. Ransom argues that the evidence was insufficient for two reasons: the record before the court "consisted largely of inadmissible [video] clips" and Ms. Williams's testimony and Ms. Pryor's testimony were "internally inconsistent and externally contradicted." We are not persuaded.

First, as noted above, whether the video exhibits were admissible or not has no bearing on whether the evidence was sufficient.

Second, although there were some inconsistencies in the testimony of Ms. Williams and Ms. Pryor, such inconsistencies generally affect only the weight of the evidence, "not its sufficiency, and are in any event for the [fact-finder] to resolve." *Gibson v. United States*, 792 A.2d 1059, 1066 (D.C. 2002). Further, "we have long held that the trial court is in the best position to observe and assess the demeanor of the witnesses." *Medina v. United States*, 61 A.3d 637, 642 (D.C. 2013) (brackets and internal quotation marks omitted). "[F]actual finding[s] anchored in credibility assessments derived from personal observations of the witnesses [are] beyond appellate reversal unless those factual findings are clearly erroneous."

*Stroman v. United States*, 878 A.2d 1241, 1244 (D.C. 2005) (internal quotation marks omitted).

Ms. Williams's testimony as to her own assault was corroborated by both the body-worn camera footage and the photographs that were admitted into evidence. With respect to the assault on M.W., the trial court relied in part on the events depicted in Exhibit 7, finding it "significant" that Mr. Ransom was running out of the apartment building while grabbing his belt. The trial court also considered, and explicitly declined to credit, Mr. Ransom's alternative version of events. Viewing the evidence in the light most favorable to the government, we conclude that a rational trier of fact could have found Mr. Ransom guilty beyond a reasonable doubt of assaulting both Ms. Williams and M.W.

## B. Authentication of Video Exhibits

"Authenticity—whether an item of evidence is genuinely what its proponent claims it is—is a component of relevance." *Johnson v. United States*, 290 A.3d 500, 509 (D.C. 2023). "Evidence must be relevant to be admissible." *Id.* "Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 509-10 (internal quotation marks omitted). "[T]his court has held that authenticity need not be established with certainty as a

condition precedent to the admission of evidence as relevant . . . ." *Id.* (internal quotation marks omitted). Rather, in general, "all that must be shown is a reasonable possibility that the evidence is what it purports to be." *Id.* (internal quotation marks omitted). One way to authenticate video footage is through the testimony of a witness who was present during the events portrayed and who testifies that the video accurately portrays those events. *Bryant v. United States*, 148 A.3d 689, 697 (D.C. 2016); *see generally, e.g.*, *Johnson*, 290 A.3d at 511 (discussing other methods of authentication).

This court reviews the trial court's decision to admit evidence for abuse of discretion. *Furr v. United States*, 157 A.3d 1245, 1250 (D.C. 2017). Nonconstitutional error in the admission of evidence does not require reversal if this court can say with fair assurance that the error was harmless—that is, that the verdict was not substantially swayed by the error. *Riddick v. United States*, 995 A.2d 212, 220 (D.C. 2010) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Mr. Ransom argues that video clips are properly admitted only if the party seeking to introduce them authenticates them through clear and convincing evidence. *Cf. Butler v. United States*, 649 A.2d 563, 567 (D.C. 1994) (in discussing admissibility of audio recording, stating that "[b]ecause recorded evidence, which may be susceptible to adulteration, is likely to have a strong impression upon a jury,

we have required that, in seeking to introduce tape-recorded conversations into evidence, the government bears the burden of showing, by clear and convincing evidence, that the proffered tapes are authentic, accurate, and trustworthy") (citations and internal quotation marks omitted). The United States argues that no heightened standard should apply to the authentication of video evidence. *Cf. Johnson*, 290 A.3d at 509-10 & n.17 (declining to apply "clear and convincing evidence" standard to authentication of social-media records). Because our disposition of this case does not turn on the resolution of this issue, we need not and do not express any view on the issue.

Even assuming that no heightened standard of authentication applies, we agree with Mr. Ransom that the trial court acted outside the scope of its discretion in admitting Exhibit 7 into evidence. As we have noted, the United States introduced no evidence about how or when Exhibit 7 was created. That is not necessarily in and of itself fatal because, as previously noted, video evidence can be authenticated through the testimony of a witness who was present during the events portrayed and who testifies that the video accurately portrays those events. *Bryant*, 148 A.3d at 697. It is true that Ms. Pryor testified generally that the video accurately depicted the events of the night at issue as she recalled them. Ordinarily, that would suffice to support admission of the video. The problem is that Ms. Pryor's testimony about the events at issue contradicted the video in two respects, the latter of which was of

critical importance: (1) whether Mr. Ransom came down the stairs or in an elevator and (2) whether Mr. Ransom had a gun in his hand. Ms. Pryor never explained how she could vouch for the accuracy of a video that contradicted her testimony. Given the absence of any such explanation, and given the absence of any other evidence as to the circumstances of the creation of the video, we hold that the trial court acted outside the scope of its discretion in admitting the video over Mr. Ransom's objection.

We further hold that the admission of Exhibit 7 was not harmless error as to Mr. Ransom's conviction for assaulting M.W. Leaving aside Exhibit 7, the government's case on that count rested entirely on Ms. Williams's testimony. In finding Mr. Ransom guilty of assaulting M.W., the trial court explicitly relied on Exhibit 7. The trial court considered it "significant" that Mr. Ransom was recorded "running out" of the building while "grabbing his belt." Given the emphasis that the trial court gave to Exhibit 7, and given the absence of other evidence on that count corroborating Ms. Williams's testimony, we cannot say with fair assurance that the verdict would have been the same if Exhibit 7 had been excluded.

We are not persuaded by the United States's suggestion that the admission of Exhibit 7 was harmless because Exhibit 7 was beneficial to Mr. Ransom on the gun-possession charge of which he was acquitted. It is true that the trial court relied

on Exhibit 7 in finding Mr. Ransom not guilty of the gun-possession charge. Nevertheless, the inquiry into whether an error was harmless must be conducted separately for each count. *See, e.g.*, *United States v. Tubol*, 191 F.3d 88, 97 (2d Cir. 1999) ("We consider the counts of conviction separately for purposes of our harmless error analysis."); *State v. Tollardo*, 275 P.3d 110, 124 (N.M. 2012) ("[B]ecause an error may be prejudicial with respect to one conviction, but harmless with respect to another, courts must separately assess the effect the error may have had on each of the defendant's convictions."). We therefore vacate Mr. Ransom's conviction for assaulting M.W.

We reach a different conclusion with respect to Mr. Ransom's conviction for assaulting Ms. Williams. For purposes of this discussion, we assume without deciding that Exhibits 1 through 5 were also erroneously admitted. Even on that assumption, we conclude with substantial assurance that the admission of the challenged exhibits did not substantially sway the trial court's determination that Mr. Ransom assaulted Ms. Williams. With respect to that charge, the evidence included not only Ms. Williams's testimony but also the testimony of Ms. Pryor, the photographs of Ms. Williams's injuries, and the body-worn camera footage of Ms. Williams's conversation with the police. The trial court credited Ms. Williams's testimony with respect to the assault and declined to credit Mr. Ransom's, and the trial court specifically emphasized that it could see bruises

on Ms. Williams's face in the photographs of Ms. Williams's injuries. Conversely, the trial court did not mention any of the challenged exhibits in reaching its conclusion that Mr. Ransom assaulted Ms. Williams. Finally, none of the challenged exhibits was direct evidence of an assault on Ms. Williams, and none of them in any way contradicted Mr. Ransom's testimony about what had happened. Accordingly, we conclude that even if all of the challenged exhibits were admitted in error, those errors were harmless as to Mr. Ransom's conviction for assaulting Ms. Williams. We therefore affirm that conviction.

For the foregoing reasons, we reverse Mr. Ransom's conviction for attempted possession of a prohibited weapon, affirm Mr. Ransom's conviction for assaulting Ms. Williams, vacate Mr. Ransom's conviction for assaulting M.W., and remand the case for further proceedings.

*So ordered.*