*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CM-1118

RITA SOLON, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 11/29/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CMD-7472-17)

(Hon. Juliet J. McKenna, Trial Judge)

(Submitted September 18, 2018               Decided November 29, 2018)

*Thomas C. Paynter* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Amy Weiner*, and *Kristina Ament*, Assistant United States Attorneys, were on the brief for appellee.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

THOMPSON, *Associate Judge*:   After a bench trial, appellant Rita Solon was convicted of disorderly conduct pursuant to D.C. Code § 22-1321 (a)(1) (2012 Repl.).   She asserts that a conviction under § 22-1321 (a)(1) required proof that someone was actually placed in fear of harm by her conduct; that the trial court erred in determining otherwise; and that the error was not harmless because, far

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CM-1118

RITA SOLON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-7472-17)

(Hon. Juliet J. McKenna, Trial Judge)

(Submitted September 18, 2018                    Decided November 29, 2018)

*Thomas C. Paynter* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Amy Weiner*, and *Kristina Ament*, Assistant United States Attorneys, were on the brief for appellee.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges.*

THOMPSON, *Associate Judge*:  After a bench trial, appellant Rita Solon was convicted of disorderly conduct pursuant to D.C. Code § 22-1321 (a)(1) (2012 Repl.). She asserts that a conviction under § 22-1321 (a)(1) required proof that someone was actually placed in fear of harm by her conduct; that the trial court erred in determining otherwise; and that the error was not harmless because, far

from compelling a conviction under the statute as correctly construed, the evidence was insufficient for conviction. We agree with appellant's arguments and therefore reverse the judgment of conviction.

## I.

During the trial, the parties stipulated to the admissibility of video footage of the incident out of which appellant's conviction arose. The video footage was shot by a journalist who testified that he covered the People's Climate Movement March on April 29, 2017. The video shows demonstrators gathered on Pennsylvania Avenue, N.W., in front of the Newseum, preparing to march. As a line of demonstrators stood in a semi-circle with linked arms, appellant walked about displaying a "TRUMP Make America Great Again" sign. At one point, appellant tried unsuccessfully to get inside the semicircle by pushing between a couple of the demonstrators whose arms were linked. For much of the rest of the video, appellant can be seen walking to and fro with her sign, in front of the group of demonstrators standing with linked arms. For much of the time, staff for the march walked back and forth behind appellant or at her side, one of them carrying a march sign. The demonstrators with linked arms have impassive faces. Other people pass by, some ignoring appellant and others pointing and laughing at or

taking photos of her. At one point, a man appears to deliberately bump against appellant. Thereafter, a voice can be heard saying, "Do not touch or engage her," and at various points voices can be heard making comments such as, "She's never going to break this chain," "Lock her up," "Let's focus on our message and our march," "She'll get tired soon," and "Get your camera ready."

Caleb-Michael Files, who was working at the march pursuant to his employer's contract with the march organizers, testified that appellant was "interacting with folks, kind of yelling," booing or "woo-woo[ing]," and "trying to spook people." Appellant was "moving forcefully into folks," and using her elbow or arm to jut or push or "ram[] herself into [the march marshals]" and trying to "crawl[] in through . . . any opening that she could find" in the line of march participants. Appellant also "stepped on one of the marshal's arms" and spat on Mr. Files's shoulder at a point prior to the time covered in the video footage. Mr. Files testified that appellant's "try[ing] to get back into the circle is scaring folks." Mr. Files testified that appellant's movements were "like woo-woo-woo, like I'm going to touch you, I'm going to come for you, I'm coming into the circle[.]" Mr. Files testified that someone hit appellant and that he put up his arm to "diffus[e] the situation" and prevent "any other altercation occurring." Mr. Files, who identified himself in the video as walking behind or alongside appellant as she was

walking back and forth, agreed on cross-examination that appellant's "woo-woo-woo" conduct was "scary" because he "had no idea what her intent was."

Emma Lanning, who told the court that she was a volunteer marshal for the march, testified that her job there was to clear the space in front of the march so that people had space to walk and so that photos could be taken of the front of the march. While waiting for the march to start, she was sitting and holding hands with the participants next to her when she heard a "commotion," "like people being surprised" and someone yelling; then, as Ms. Lanning was trying to stand up, she felt appellant step on her left arm. Ms. Lanning saw appellant "after she was running away from" her. She also saw appellant "starting to harass other people" by "yelling quite loudly, . . . getting in people's faces[,] clearly trying to . . . provoke a response from someone," "being really aggressive in her body language," "marching around aggressively with her flag," and "trying to . . . startle people by getting in their faces" about "a foot or so" away from them. People "repeatedly asked [appellant] very politely to . . . step aside, or to move back, and she didn't respond to that well." Appellant was "looking for a way to get into the circle" of participants.

MPD officer Doran Gunnells testified that appellant told him to "call backup," a remark he interpreted to mean that appellant was "getting agitated and wanted to fight or resist arrest." Officer Gunnells also testified that appellant told him that she was "not going to let [the participants] do their thing and let them march."

Journalist Clifford Kincaid, who shot the video footage, testified for the defense. He testified that it did not appear to him that anyone was scared or in fear of appellant. He testified that people were "harassing" her, "[n]ot running from her." According to Mr. Kincaid, appellant, who was "walking back and forth with her flag," did not "engage any one person" though "probably [came] within a foot or two" of one person. Mr. Kincaid agreed that "there were points when [appellant] wasn't in [his] field of vision."

The trial court granted appellant's motion for judgment of acquittal on the charge that she assaulted Ms. Lanning, finding that the "more reasonable inference would be that that was an accidental touching in an attempt to break into the circle." At the close of the evidence the court also acquitted appellant of the charge that she assaulted Mr. Files by spitting on him. The court stated that it was "unable to conclude beyond a reasonable doubt that [appellant] intentionally spat

upon [him]" and also was "not convinced beyond a reasonable doubt that [appellant] acted with the requisite intent to cause injury or to create fear[.]"

The trial court found appellant guilty on the sole count of disorderly conduct based on appellant's conduct of "ramming of her body into individuals who ha[d] not initiated any physical interaction with [her], but [we]re standing peacefully, expressing their views[.]"[1]  The court explained its ruling as follows:

> [M]y interpretation of that is that the [g]overnment is not required to prove that these individuals who are physically rammed by Ms. Solon, were in actual fear of injury, because I would agree with Mr. Simmons, that's not what the video depicts.  These individuals don't appear to be in fear, they don't remain in place, but [I do] find that Ms. Solon's actions were sufficient to prove that these actions would have created in a person of reasonable sensibility, a fear of immediate bodily harm.
>
> I do find that her actions were such and I note that not only is she seen in the video and not only did Mr. Files testify that she rammed herself up against other individuals who were present with her shoulder, but that she also is depicted in the video . . .  pacing back and forth, that her general demeanor is such the level of agitation and the level of volatility that she's displaying,

---

[1]  In her opening statement and closing argument, the prosecutor told the court that the basis for the disorderly conduct charge was also appellant's "lunging and yipping that was designed to be sudden and frightening" and to "startle and frighten the protestors."  The government's brief asserts in addition that march staff members "recoiled" as appellant came near them.  The trial court, however, made no finding about that alleged conduct.

that considering all of the surrounding circumstances that could have created in a person [of] reasonable sensibility a fear of immediate bodily harm.

The court reasoned that "the greatest guidance can be drawn from looking at the simple assault statute which uses very similar language in speaking about an individual intentionally and recklessly acting in a manner as to cause another person to be in reasonable fear that a person is likely to be harmed."[2]

This appeal followed.

---

[2]    The court's reference to the simple assault statute was in error, as that statute (D.C. Code § 22-404 (a)(1) (2012 Repl.)) does not include such expansive language.  The court probably meant to refer to the standard intent-to-frighten-assault jury instruction, as it did before announcing its verdict.  The court reasoned:

> [W]hy would it be any different on the disorderly conduct [charge] than it is for the simple assault [charge] as to which the government need not prove that the complaining witness actually experienced fear of injury, but it's sufficient for the [g]overnment to prove that the defendant's act would have created[,] in a person of reasonable sensibility, a fear of imminent bodily harm[.] [T]hat's the instruction in simple assault, and I don't understand why the standard would be any different when it comes to disorderly conduct.

This court's case law on intent-to-frighten assault reflects the standard the trial court applied.  *See, e.g.*, *Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986) ("Intent-to-frighten assault . . . requires proof that the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct[.]").

## II.

"We review *de novo* the trial court's legal conclusions and any issues of statutory construction." *Mitchell v. United States*, 977 A.2d 959, 963 (D.C. 2009). "In our review of a judgment following a bench trial, we 'may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it.'" *Lewis v. Estate of Lewis*, 2018 D.C. App. LEXIS 399, *7-8 (quoting D.C. Code § 17-305 (a) (2012 Repl.)).

## III.

The charging document in this case alleged "Disorderly Conduct – Creating Fear, in violation of D.C. Code § 22-1321 (a)(1)." Section 22-1321 (a)(1) provides in pertinent part:

> In any place open to the general public, . . . it is unlawful for a person to intentionally or recklessly act in such a manner to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken.

Notably, the government did not charge appellant with having committed disorderly conduct under D.C. Code § 22-1321 (g) (stating in pertinent part that "[i]t is unlawful, under circumstances whereby a breach of the peace may be occasioned, to interfere with any person in any public place by jostling against the person").

The primary issue raised in this appeal is whether the statutory language in § 22-1321 (a)(1), "in such a manner as to cause another person to be in . . . fear," requires the government, in order to obtain a conviction, to prove that a person was put in actual fear by the defendant's conduct. For the following reasons, we hold that it does.[3]

We begin with "[t]he primary and general rule of statutory construction . . . that the intent of the lawmaker is to be found in the language that he has used." *Jeffrey v. United States*, 892 A.2d 1122, 1128 (D.C. 2006) (quoting *Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (internal quotation marks omitted)). "[I]n examining the statutory language, it is axiomatic that the words of the statute should be construed according to their ordinary sense

---

[3] Thus, we reject the government's argument that § 22-1321 (a)(1) does not require proof that "some individual actually experienced fear" to prove disorderly conduct.

and with the meaning commonly attributed to them." *Id.* (internal quotation marks omitted). That said, we "have repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute" given that "literalness may strangle meaning." *Peoples Drug Stores*, 470 A.2d at 754 (internal quotation marks omitted). "A cornerstone of statutory interpretation is the rule that a court 'will not look beyond the plain meaning of a statute when the language is unambiguous and does not produce an absurd result.'" *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1023, (D.C. 2007) (quoting *J. Frog, Ltd. v. Fleming*, 598 A.2d 735, 738 (D.C. 1991)). Usually, "[t]he primacy of the statutory text means that resort[ing] to legislative history . . . is appropriate only to resolve a genuine ambiguity or a claim that the 'plain meaning' leads to a result that would be absurd, unreasonable, or contrary to the clear purpose of the legislation." *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011).

We think that the most natural reading of § 22-1321 (a)(1) is that it requires proof that another person was "cause[d] . . . to be in . . . fear."[4] Some courts interpreting analogous language in other statutes have given effect to such a natural reading. *See, e.g.*, *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012)

---

[4] Its language is unlike that used in our case law on intent-to-frighten assault, which, as noted, requires proof of "intent . . . to create apprehension." *Robinson*, 506 A.2d at 574.

(holding that there was no probable cause for defendant's arrest for third-degree menacing under statute that proscribed "plac[ing] another person in fear of . . . physical injury" "because the officer spoke with the complainant before deciding to make an arrest and she 'never stated that she felt physically threatened or that Ackerson took any assaultive actions.'"); *Sinclair v. Daly*, 672 S.E.2d 672, 674-75 (Ga. Ct. App. 2009) (holding that the trial court abused its discretion in granting a protective order based on stalking because the stalking statute proscribed "harassing and intimidating the other person," and "harassing and intimidating" means "placing such [other] person in reasonable fear for such person's safety," but the protective-order petitioner "did not . . . testify that Sinclair's actions caused him to fear for his safety" (italics omitted)); *State v. Chiofar*, 2009 Wash. App. LEXIS 2362, *5 (Wash. Ct. App. 2009) (applying a criminal harassment statute that required that the defendant "by words or conduct place[d] the person threatened in reasonable fear that the threat will be carried out," and holding that there was an insufficient factual basis for the defendant's guilty plea because under the statute "there must be some evidence establishing actual fear of injury" but nothing "support[ed] a reasonable inference that [the complainant] actually feared that [the defendant] would harm her in any way.").

We are aware, however, that other courts have interpreted statutes with language similar to that of § 22-1321 (a)(1) to require no more than proof that a reasonable person or ordinary person would be placed in fear (or would be otherwise affected in the way the statute describes) by the defendant's conduct. *See, e.g.*, *United States v. Gilmore*, 282 F.3d 398, 402 (6th Cir. 2002) (applying federal bank robbery statute that prohibits taking "by force and violence, or by intimidation," and stating that whether intimidation exists "is determined by an objective test: whether an ordinary person in the teller's position could reasonably infer a threat of bodily harm from the defendant's acts"); *United States v. Alsop*, 479 F.2d 65, 67 (9th Cir. 1973) (applying federal bank robbery statute and explaining that "[t]he determination of whether there has been an intimidation should be guided by an objective test [that] focus[es] on the accused's actions" and that "requires the application of the standard of the ordinary man"; suggesting a jury instruction that "intimidation" means "to take, in such a way that would put an ordinary, reasonable person in fear of bodily harm").

Given the foregoing divergent interpretations of statutory language that appears to require causing a certain mental state in the victim, we conclude that the plain language of § 22-1321 (a)(1) is ambiguous and that a resort to its legislative

history is necessary to shed light on what the Council of the District of Columbia (the "Council") intended.

Looking to the legislative history, the government relies on a "Disorderly Conduct Arrest Project Subcommittee" Report (the "Subcommittee Report") recommendation that there was no need for the Council to include a specific anti-jostling prohibition in the disorderly conduct statute because that "sort of misconduct is covered by the more general prohibition against intentionally or recklessly putting another person in reasonable fear of harm to his [or] her person [i.e., § 22-1321 (a)(1)]." Attachment to the Report on Bill 18-425, "the Disorderly Conduct Amendment Act of 2010" at 79. Based on that statement in the Subcommittee Report, the government argues that appellant's having "deliberately 'jostled' members of the march . . . constitute[d] disorderly conduct as contemplated by the Council." That argument is not persuasive because the document that is pertinent in discerning the Council's intent is not the Subcommittee Report, but instead the Committee on Public Safety and the Judiciary Report (the "Committee Report"), which *rejected* the Subcommittee's recommendation. The Committee on Public Safety and the Judiciary explained:

> Subsection (g) prohibits jostling, unnecessary crowding,
> and placing one's hand near a wallet or bag where the

> victim might react with violence (e.g., slapping the person's hand away, or however one might react when he or she perceives they are about to become the victim of a pickpocket or snatch-and-run, or whereby a fight might be provoked by the jostling or crowding). *The Committee is uncomfortable with the assertion . . . that subsection (a)(1) is adequate; for instance, what if the victim does not know he is about to be pickpocketed?"*

Committee Report at 9 (italics added). We read the Committee's explanation highlighted above as clarifying that § 22-1321 (a)(1) requires proof that the victim was placed in the state of mind the subsection describes (i.e., fear), and that § 22-1321 (a)(1) does not reach conduct that, while perhaps otherwise unlawful, did not actually evoke from the victim the state of mind the Council had in mind.

In light of the legislative history, we disagree with the trial court's interpretation of § 22-1321 (a)(1). We hold that § 22-1321 (a)(1) requires proof that the defendant's charged conduct placed another person in fear of harm to his or her person (and, as the statute states, the fear must be "reasonable fear"). The trial court erred in determining otherwise, and we must now consider whether the error was harmless. It was not. Even though the court found that the individuals on the scene "don't appear to be in fear," the court convicted appellant of disorderly conduct under § 22-1321 (a)(1) because her "actions would have created [a fear of imminent bodily harm] in a person of reasonable sensibility."

Ordinarily, if the trial court has applied an erroneous interpretation of the statute, we would remand for the trial court to reconsider its verdict while applying the correct interpretation. We do not take that approach here because we are satisfied that the evidence was not sufficient to sustain appellant's conviction under § 22-1321 (a)(1). In evaluating the sufficiency of the evidence to support a criminal conviction, we must assess the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact . . . ." *Walker v. United States*, 167 A.3d 1191, 1201 (D.C. 2017) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)). "[T]he evidence is sufficient if, after viewing it . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brooks v. United States*, 130 A.3d 952, 955 (D.C. 2016) (internal quotation marks omitted). We have "an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a [fact-finder] behaving rationally really could find it persuasive beyond a reasonable doubt." *Id.* (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)).

Here, the trial court's finding that "[t]he[] individuals [on the scene who witnessed appellant's conduct] don't appear to be in fear" was neither "plainly wrong [n]or without evidence to support it." D.C. Code § 17-305 (a). Moreover, even as to the individuals who were physically rammed by appellant, the evidence does not support an inference that the individuals on the scene were in fear from appellant's conduct that their persons or property were likely to be harmed or taken. To be sure, there was evidence that as a result of appellant's having stepped on her arm, Ms. Lanning sustained "physical[] injur[y]," i.e., "scratches on [her] arm." But Ms. Lanning's testimony was that this occurred while she was "still quite low to the ground" and appellant attempted to step over her. By contrast, the video shows that the "ramming" incident occurred while the participants were *standing* with locked arms. It provides no basis for inferring that the participants feared any similar injury from being stepped over (though they may well have feared that appellant would get inside their semicircle).

Further, as appellant argues, there are a number of reasons supporting the trial court's finding that the individuals on the scene were not afraid: the marchers' faces were impassive, other people can be seen laughing, it was broad daylight and police were present, appellant was alone while there were many people waiting to march, some marchers or staff were following or even harassing

appellant rather than distancing themselves from her, and there was no evidence that anyone complained to Officer Gunnells or the other officers that they were afraid of physical harm. Mr. Files agreed on cross-examination that appellant's "woo-woo-woo" conduct was "scary," but explained that this was because he "had no idea what her intent was"; he did not testify that he feared injury to his person or property from appellant's conduct. Thus, even if appellant was "trying to spook people" and even if they were "scar[ed]" of her "try[ing] to get back into the circle," there was no evidence that she caused anyone to fear harm to his or her person or property.[5]

Wherefore, the judgment of conviction is reversed. The trial court is instructed to enter a judgment of acquittal.

*So ordered.*

---

[5] Given our disposition of the case, we need not consider appellant's other arguments, including her argument that the conduct for which she was convicted was protected by the First Amendment.